**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

JUAN MARIN,

*Plaintiff,* **CASE NO.: 26-CV-60755-AHS**

v.

TUFF SHED, INC.,

*Defendant.*
_________________________________/

**AMENDED COMPLAINT**

1. Plaintiff Juan Marin worked for Defendant Tuff Shed as an installer. He principally built sheds for Home Depot customers.
2. Throughout his employment, Tuff Shed misclassified Marin as an independent contractor while controlling him like an employee.
3. Marin repeatedly questioned his classification as an independent contractor. Often, when he did so, Tuff Shed would retaliate against him by taking him off the schedule.
4. Also, throughout his employment, Tuff Shed frequently would dock Marin's pay for issues that had nothing to do with his workmanship.
5. For instance, if a customer complained about damaged building materials (which damage was not Marin's fault), Tuff Shed would dock Marin's pay.
6. If a customer was unhappy with the end product (i.e. it was not what they felt Tuff Shed had originally promised), Tuff Shed would dock Marin's pay.
7. In some instances, Tuff Shed would attempt to justify docking Marin's pay by falsely claiming that his work had failed local building code inspections.

8. Tuff Shed agents and employees spread these false representations among Marin's colleagues, co-workers and supervisors, thereby harming his reputation.

9. Ultimately, after Marin had complained about these various business practices one too many times, Tuff Shed fired him.

10. This is an action for unpaid wages in violation of the Fair Labor Standards Act ("FLSA"), retaliation in violation of the FLSA, fraud and defamation.

**PARTIES, JURISDICTION AND VENUE**

11. Plaintiff was a citizen of Polk County, Florida at all times relevant to this Complaint.

12. Plaintiff was an employee of Defendant within the meaning of 29 U.S.C. § 203(e).

13. Defendant is a Colorado for-profit corporation with its principal place of business in Denver, Colorado. Tuff Shed conducts business throughout the United States including substantial business within the State of Florida and this District.

14. Defendant was Plaintiff's employer within the meaning of 29 U.S.C. § 203(d), was an "enterprise engaged in commerce" within the meaning of 29 U.S.C. § 203, and grossed more than $500,000 per annum at all times relevant.

15. At all times material, Defendant maintained control, oversight, and discretion over Plaintiff in his capacity as an employee of Tuff Shed, Inc., and the terms and conditions of his work, including the power to set schedules, assign work, determine compensation, and impose deductions that harmed Plaintiff.

16. This Court has subject matter jurisdiction over claims arising under 29 U.S.C. § 201. 28 U.S.C. § 1331.

17. This Court has supplemental jurisdiction over Plaintiff's common law claims as they are so closely related to his FLSA claims that they form part of the same case or controversy. 28 U.S.C. §1367.

18. This Court has personal jurisdiction over Defendant because Defendant continuously conducts significant business in this District.

19. Venue is proper because Defendant is subject to personal jurisdiction in this District and because certain of the acts giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b). Plaintiff performed work for Defendant in this District and Defendant's personnel within this District participated in the conduct at issue in this case.

**GENERAL ALLEGATIONS**

20. Tuff Shed, Inc. is in the business of manufacturing sheds, garages, storage buildings and related products. It also provides installation services related to its products for its customers. Tuff Shed performs a significant amount of work for Home Depot.

21. Defendant hired Plaintiff as an Installer in March 2018, where he installed Tuff Shed products for residential and commercial customers.

22. Although Defendant labeled him an "independent contractor", Defendant exercised substantial control over Plaintiff's work, including:

    a. Job assignments and scheduling;

    b. Pricing and payment amounts per project;

    c. Inspection procedures;

    d. Mandated documentation uploads of photographs showing progress of construction, mandatory job board updates, as well as calls and text messages with Tuff Shed management every day for updates on progress;

e. Mandated background checks and Home Depot credentialing on every assignment for Plaintiff and any assistant installers who helped him perform his work;

f. Mandated meetings regarding the method and manner regarding the construction of Tuff Shed products.

23. If Plaintiff declined individual jobs, especially due to pricing, distance, or scope, it would result in fewer assignments or removal from future scheduling.

24. Defendant's marketing materials represented that its installations are backed by corporate oversight.

25. Throughout Plaintiff's employment, Defendant maintained authority to deduct compensation through "chargebacks," reducing the amount paid to Plaintiff from what was previously agreed to under the guise that Plaintiff committed errors in installation or caused damage. If a customer was upset with a job that Plaintiff completed correctly, Defendant would offer discounts to the customer at Plaintiff's expense. Similarly, if Defendant provided Plaintiff with incorrect or damaged materials that led to customer complaints, Defendant would charge the cost to Plaintiff from the agreed upon pay for his project.

26. In June 2018, Plaintiff requested a transfer to a different location due to irregularities in payment that he received while working at Tuff Shed's Miami location. In response, Christopher Diparne, General Manager of Tuff Shed Miami and Fort Lauderdale, incorrectly accused him of improper installation, demanded that he fix projects that were correctly installed, and threatened to take him off the schedule.

27. In September 2018, Plaintiff sent a written complaint regarding Defendant's payment practices, specifically that it was incorrectly paying him and deducting from the agreed upon price for projects. However, nothing changed.

28. Throughout Plaintiff's employment, Defendant repeatedly told Plaintiff, his colleagues, and his supervisors that Plaintiff's projects failed municipal inspections. Defendant did this to force Plaintiff to return to job sites and perform labor without additional payment or face termination. These representations were false.

29. For example, on November 21, 2025, Brianna Millan, Scheduling Coordinator, emailed Plaintiff and notified him that Defendant would impose chargebacks against him due to alleged workmanship errors, inspection fees, and failed municipal inspections, with Defendant's management copied on the email. Defendant circulated these false statements among personnel involved with the project. In fact, Plaintiff's work had not failed inspection.

30. Defendant would not return wages owed to Plaintiff even when he provided proof that his work did not fail municipal inspections.

31. Defendant either knew these statements were false or acted in reckless disregard of the truth.

32. Plaintiff's workweeks typically included multi-day installations, unpaid mandatory revisits to perform additional work, and travel time between job sites.

33. Defendant paid Plaintiff on a per-job basis and did not pay overtime premiums for hours worked in excess of forty (40) per week. Plaintiff regularly worked approximately sixty hours per week.

34. Defendant was fully aware that Plaintiff worked more than forty (40) hours per week on its behalf.

35. Defendant's failure to pay overtime was willful.

36. In December 2025, Plaintiff complained to Marwin Martinez, Operations Manager, that:

    a. he was being misclassified as an independent contractor;

b. Defendant was not paying him overtime;

c. wage deductions and chargebacks were improper.

37. Following his complaint, Martinez advised Plaintiff that Defendant would impose a $585 chargeback against him for a door that was scratched before Plaintiff installed it. Plaintiff disputed the chargeback, explaining that the damage was not his fault and that Defendant had provided incorrect materials and failed to pay him properly for completed work.

38. Shortly after Plaintiff raised his complaints, Defendant terminated him on or about December 11, 2025 by removing all of his pending and active jobs from the schedule.

39. Defendant intentionally failed to maintain accurate pay records and did not properly track Plaintiff's hours worked.

40. Plaintiff was required to return and perform additional work without pay based on Defendant's false representations regarding failed inspections.

**COUNT I**
**VIOLATION OF THE FLSA - OVERTIME**

41. Plaintiff repeats and realleges paragraphs 1–40 as if fully set forth herein.

42. Plaintiff regularly worked for Tuff Shed in excess of forty (40) hours per workweek, including multi-day installations, travel between job sites, and unpaid return visits.

43. Although Plaintiff signed an Independent Contractor Agreement, under the economic realities test he was an employee within the meaning of the FLSA.

44. Defendant exercised substantial control over Plaintiff's work, including assignments, scheduling, pricing, inspection requirements, and daily reporting obligations, all consistent with employee status.

45. Plaintiff did not qualify as an executive, administrative, outside sales employee, or any other category of exempt employee under 29 U.S.C. § 213.

46. Plaintiff's work installing sheds directly affected interstate commerce.

47. Tuff Shed failed to make, keep, and preserve accurate records of Plaintiff's hours worked each workday and each workweek as required by 29 U.S.C. § 211(c).

48. Tuff Shed paid Plaintiff on a per-job basis and did not pay overtime compensation for hours worked over forty (40) per week.

49. As a result, Plaintiff is entitled to recover unpaid overtime compensation, liquidated damages, and attorneys' fees pursuant to 29 U.S.C. § 216(b).

50. Tuff Shed's conduct was knowing, intentional, willful, and part of the Company's business model.

51. Due to these unlawful acts, Plaintiff suffered damages in an amount to be determined at trial.

**COUNT II**
**VIOLATION OF THE FLSA - RETALIATION**

52. Plaintiff repeats and realleges paragraphs 1–40 as if fully set forth herein.

53. Plaintiff engaged in protected activity under the FLSA by complaining to Tuff Shed management that:

    a. He was being misclassified as an independent contractor;

    b. He was not being paid overtime wages;

    c. Wage deductions and chargebacks were improper.

54. Plaintiff's complaints were clear and sufficiently specific to inform Defendant that he was asserting rights protected by the FLSA.

55. Defendant understood Plaintiff's complaints to be assertions of statutory wage rights.

56. In response to Plaintiff's complaints, Defendant reduced his work opportunities, imposed unjustified chargebacks, and ultimately terminated him.

57. These actions constitute adverse employment actions under 29 U.S.C. § 215(a)(3).

58. The adverse actions were causally connected to Plaintiff's protected activity, including termination shortly after his December 2025 complaints.

59. Defendant's conduct was intentional and retaliatory.

60. As a direct result, Plaintiff suffered damages including lost wages and other non-economic damages in an amount to be determined at trial.

**COUNT III**
**FRAUD**

61. Plaintiff repeats and realleges paragraphs 1 through 40 as if fully set forth herein.

62. On multiple occasions throughout Plaintiff's employment, Tuff Shed falsely represented that specific installations done by Plaintiff "failed" municipal inspections and required him to perform immediate corrective work.

63. For example, on November 21, 2025, Defendant, through its Scheduling Coordinator, falsely represented to Plaintiff via email, copied to management, that his work had failed inspection when it had not. Defendant did this to induce Plaintiff to perform additional work on the job without further compensation.

64. Defendant routinely made fraudulent representations regarding failed inspections in order to get Plaintiff to return to job sites and complete additional labor without compensation.

65. Defendant knew that these statements were false when they were made or made them with reckless disregard for their truth, including when municipal inspections showed that Plaintiff's installations had passed.

66. These statements were intended and in fact did induce Plaintiff's reliance upon them.

67. Plaintiff justifiably relied on Defendant's false statements regarding the failed inspections and would complete additional free labor.

68. As a direct and proximate result of Defendant's misrepresentations, Plaintiff has been damaged as a result in an amount to be determined at trial.

**COUNT IV**
**DEFAMATION *PER SE***

69. Plaintiff repeats and realleges paragraphs 1–40 as if fully set forth herein.

70. Defendant, through its agents and employees, published statements to Plaintiff's colleagues, coworkers, and supervisors that Plaintiff performed defective work and that his installations failed municipal inspections, including in communications such as the November 21, 2025 email circulated to management.

71. These statements were communicated to individuals involved in assigning work and evaluating Plaintiff's job performance.

72. These statements were false.

73. Tuff Shed knew that these statements were false when publishing them.

74. Tuff Shed's repeated false statements about Marin's poor workmanship and failed inspections constitute defamation *per se* because on their face they impute to Marin characteristics that are incompatible with his lawful trade and profession and harm him in his business reputation.

75. At the time the statements were made, Tuff Shed knew or should have known that such statements would harm Marin's personal and professional business opportunities, his career, and ultimately his ability to earn a living.

76. Tuff Shed made these statements with actual malice because it knew of the statements' falsity or made the statements with reckless disregard for their truth or falsity.

77. Tuff Shed made these statements with actual malice in that the statements were part of Tuff Shed's scheme to extract free labor from Plaintiff under the guise of failed inspections.

78. In making the defamatory statements, Tuff Shed acted intentionally, maliciously, willfully, and with the intent to injure Marin.

79. Tuff Shed's conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately to cause Marin harm.

80. As a result of Tuff Shed's defamatory statements, Plaintiff is entitled to presumed damages and punitive damages in an amount to be determined at trial.

**COUNT V**
**DEFAMATION PER QUOD**
**(IN THE ALTERNATIVE TO COUNT IV)**

81. Plaintiff repeats and realleges paragraphs 1 through 40 as if fully set forth herein.

82. Defendant, through its agents and employees, published statements to Plaintiff's colleagues, coworkers, and supervisors that Plaintiff performed defective work and that his installations failed municipal inspections, including in communications such as the November 21, 2025 email circulated to management.

83. These statements were communicated to individuals involved in assigning work and evaluating Plaintiff's job performance.

84. These statements were false.

85. Tuff Shed knew that these statements were false when publishing them.

86. At the time the statements were made, Tuff Shed knew or should have known that such statements would harm Marin's personal and professional business opportunities, his career, and ultimately his ability to earn a living.

87. Tuff Shed made these statements with actual malice because it knew of the statements' falsity or made the statements with reckless disregard for their truth or falsity.

88. Tuff Shed made these statements with actual malice in that the statements were part of Tuff Shed's scheme to extract free labor from Plaintiff under the guise of failed inspections.

89. In making the defamatory statements, Tuff Shed acted intentionally, maliciously, willfully, and with the intent to injure Marin.

90. Marin has been harmed by the diminished value of the goodwill he built in his community and harm to his reputation as an installer and craftsman. Marin has suffered economic damages, special damages, reputational damages, and is entitled to punitive damages, all in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff seeks the following relief:

a. Unpaid overtime wages under the FLSA;

b. Liquidated damages under the FLSA;

c. Economic damages flowing from unlawful retaliation in violation of the FLSA;

d. Compensatory damages for unlawful retaliation in violation of the FLSA;

e. Compensatory damages for fraudulent conduct;

f. Punitive damages for fraudulent conduct;

g. Presumed damages for defamation *per se*;

h. Punitive damages for defamation *per s*e;

i. Reputational damages for defamation *per quod*;

j. Financial damages for defamation *per quod*;

k. Punitive damages for defamation *per quod*;

l. Reasonable attorneys' fees and costs;

m. Pre-judgment and post-judgment interest; and

n. Such other relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims triable.

Dated: April 1, 2026

Respectfully submitted,

By: */s/ Jonathan Pollard*

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

**Pollard PLLC**
500 E. Broward Ave., Suite 950
Fort Lauderdale, FL 33394
Telephone: 954-332-2380
Facsimile: 866-594-5731

*Attorneys for Plaintiff Juan Marin*